1

2

3                        UNITED STATES DISTRICT COURT

4                       NORTHERN DISTRICT OF CALIFORNIA

5

6

7    METROPCS INC., a Delaware
     Corporation,
8
                    Plaintiff,                  No. C 02-3442 PJH
9
            v.                                  **FINDINGS OF FACT AND
10                                              CONCLUSIONS OF LAW**
     THE CITY AND COUNTY OF SAN
11   FRANCISCO, CALIFORNIA, and THE
     BOARD OF SUPERVISORS OF THE CITY
12   AND COUNTY OF SAN FRANCISCO,

13                  Defendants.
     _____/
14

15          This matter was tried before the court for a period of five days commencing March

16   27, 2006.  Plaintiff MetroPCS, Inc. ("MetroPCS") has brought an action against defendants

17   the City and County of San Francisco and the Board of Supervisors of the City and County

18   of San Francisco (collectively the "City") arising from the City's denial of MetroPCS'

19   application for a conditional use permit ("CUP") to install a wireless antenna facility at 5200

20   Geary Boulevard.  MetroPCS asserts that the City violated the Telecommunications Act of

21   1996, 47 U.S.C. §§ 332(c)(7)(B)(i)(I) and 332(c)(7)(B)(i)(II), and denied it equal protection

22   of the law pursuant to 42 U.S.C. § 1983.  MetroPCS appeared through its counsel, Martin

23   Fineman and Treg Tremont, and the City appeared through its counsel, William Sanders

24   and Andrew Gschwind.

25                              **BACKGROUND**

26          Based upon the evidence presented at trial, the court makes the following findings of

27   fact, which set forth the background of this litigation.

28

*United States District Court*
For the Northern District of California

A.    MetroPCS

MetroPCS is a telecommunications carrier that provides wireless services.  The Federal Communications Commission ("FCC") has licensed MetroPCS to construct and operate wireless communications facilities in the San Francisco-Oakland-San Jose metropolitan areas.  Within those areas, MetroPCS competes primarily with Sprint, Verizon, and Cingular (now merged with AT&T Wireless) for wireless customers.

MetroPCS distinguishes itself from its competitors by targeting what it terms the "underserved" population of wireless customers – e.g., middle and lower income persons, including persons of color, and small businesses.  MetroPCS' target base includes individuals for whom plan pricing is a determinative factor, those who dislike the concept of potentially large cell phone bills (due to unanticipated charges), and those for whom obtaining credit might be a problem.  In order to serve its targeted base, MetroPCS requires no contracts, and provides a flat rate service fee of $35, which allows customers to make unlimited calls in any given month.  MetroPCS is also the only local carrier to offer monthly pre-paid service, which allows it to provide its wireless services to customers without requiring them to first undergo a credit check.

MetroPCS' mission is to provide reliable wireless coverage wherever people "live, work, and play."  This means that MetroPCS seeks to provide comprehensive outdoor, in-vehicle, and in-building coverage.[1]  MetroPCS believes that providing comprehensive coverage on each of these fronts is necessary in order for it to meet customer expectations, and to effectively compete with other wireless service providers.

In order for MetroPCS to build out its network and provide cellular coverage, MetroPCS must install various wireless antenna facilities known as "cell sites."  See Exh. 81.  A given cell site provides wireless coverage for the area surrounding its location.  Id. These cell sites are an integral part of a given carrier's network, because they enable the

---

[1]    "In-vehicle" coverage refers to the ability of customers to place calls while traveling in their vehicles. "In-building" coverage refers to the ability of customers to place calls while inside their own residences, or other commercial and private buildings.

United States District Court

For the Northern District of California

two way communication system that allows customers to place and maintain cellular calls. Id.

A carrier's cellular system (i.e., network) consists of numerous cell sites placed next to and around each other, in a honeycomb-like grid pattern. See id. In order for a customer to place and maintain an uninterrupted telephone call on the network, the telephone call must be able to pass between cell sites without interruption. If there is insufficient coverage overlap between cell sites, a customer will experience blocked or dropped calls.

MetroPCS cannot provide the reliable and adequate wireless service it seeks to provide if, as a result of an insufficient number of cell sites, or the placement of cell sites at inferior locations, significant "gaps" exist in its network that prevent customers from making continuous and uninterrupted calls.

B.      MetroPCS' Perceived Need for Coverage in the Richmond District

MetroPCS views the Richmond district in San Francisco as a potentially critical target zone for customers. Within the Richmond district, MetroPCS specifically views Geary Boulevard as a critical component of its attempt to build out its network: it is viewed as a well-traveled thoroughfare in an important part of the city.

Based on a comparison of the Richmond district's demographics with MetroPCS' targeted customer base, MetroPCS believes it should have a higher penetration rate in the Richmond district.[2] However, the current level of coverage there is insufficient, preventing MetroPCS from offering an appealing product in the district. Accordingly, MetroPCS believes it needs to build additional cell sites in the Richmond in order to provide sufficient coverage there.

C.      MetroPCS' CUP Application for 5200 Geary Boulevard

1.      The Selection Process

---

[2]      The penetration rate refers to the percentage of people, per every 100, in a given zip code who subscribe to a carrier's wireless service.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1   MetroPCS' selection of a wireless facility location generally begins with the drawing

2   of a "search ring" that targets the area to be served by the proposed facility.  Afterwards,

3   radio frequency ("RF") engineers determine the best location for a cell site within the search

4   ring.  Once this second step is completed, MetroPCS' RF engineers and siting specialists

5   together determine whether the proposed site requires any modifications – for example,

6   with respect to antenna visibility concerns, or otherwise.  Finally, once the proper site has

7   been determined, MetroPCS must locate the landlord or owner of the site, to ensure that

8   he/she is actually willing to lease the site to MetroPCS.

9   Originally, MetroPCS settled on the Mar Commercial Building, located at 4715-4723

10   Geary Boulevard, as the preferred location for the construction of its cell site.  To that end,

11   MetroPCS filed an application with the city's Planning Department for a conditional use

12   permit for this location.  MetroPCS was forced, however, to withdraw its application when

13   the proposed site met with substantial community opposition.  MetroPCS withdrew its CUP

14   application regarding the Mar Commercial building in part with the understanding that the

15   Richmond community members who opposed the Mar Commercial building site would not

16   oppose any alternative site chosen by MetroPCS.

17   As part of its original application in connection with the Mar Commercial building,

18   MetroPCS submitted an alternative site analysis report in which 5200 Geary Boulevard was

19   identified as one of 18 alternative sites that MetroPCS had investigated.  See Exh. A23 at

20   G152-58.  In that site analysis, the 5200 Geary site was identified as "not technologically

21   feasible."  Id. at G156.  The primary reason for not finding the 5200 Geary site feasible had

22   to do with height concerns – the 5200 Geary site was approximately 40 feet tall, whereas

23   the Mar Commercial building was over 80 feet tall, and therefore more ideal from an RF

24   engineering perspective.

25   Similarly, the other 17 alternative sites listed in MetroPCS' original application were

26   all determined not to be "technologically feasible."  See Exh.  A23 at G152-157.  Among

27   these sites was the Pacific Bell building, located at 389 9th Ave.

28

**United States District Court**
For the Northern District of California

1    When MetroPCS was forced to withdraw its application in connection with the Mar

2   Commercial building, it was forced to go "back to the drawing board" and re-evaluate

3   alternative sites.  In doing so, the 5200 Geary site became the "feasible" alternative to the

4   Mar Commercial building when MetroPCS realized that the original concerns over height

5   could be somewhat alleviated by placing the wireless antennas on light poles that already

6   existed on the parking structure at 5200 Geary Boulevard.  Doing so would add

7   approximately 16 feet of additional height to the proposed facility.  With respect to the

8   Pacific Bell building, it was also considered as an alternative to the Mar Commercial

9   building, but a proposed site on the Pacific Bell building faced opposition from the

10   surrounding neighbors and community.

11    MetroPCS attempted to meet with neighborhood community members in connection

12   with the 5200 Geary site.  It met with the Planning Association for the Richmond and

13   conducted a community meeting regarding the proposed site at 5200 Geary Boulevard.

14   Pursuant to the Wireless Telecommunication Services Facilities Siting Guidelines, it sent

15   notice of the community meeting to Richmond neighborhood groups, as well as to owners

16   and tenants located within 300 feet of the proposed site.  The community meeting was

17   attended by four individuals, none of whom expressed opposition to the CUP application

18   regarding the 5200 Geary site.

19    MetroPCS thereafter decided that the 5200 Geary site was the best alternative for its

20   proposed cell site.

21              2.      The Application Process

22    Under the City and County of San Francisco Planning Code ("Planning Code"), the

23   installation of a wireless facility in certain zoning districts requires a conditional use permit.

24   In order to establish that a conditional use permit is warranted, an applicant for such a

25   permit must show that the proposed use is necessary or desirable for, and compatible with,

26   the neighborhood or the community.  See Exh. A16 (Planning Code § 303(c)).

27    The San Francisco Planning Commission ("Planning Commission") has the power to

28

United States District Court

For the Northern District of California

1    hear and decide all applications for conditional use permits, although its decision to grant a

2    CUP application may be appealed to the San Francisco Board of Supervisors (the "Board").

3    See id. at § 308.1(a).

4         In order to aid the Planning Commission in evaluating CUP applications, the San

5    Francisco Planning Department adopted the Wireless Telecommunication Services

6    Facilities Siting Guidelines ("Siting Guidelines").  All CUP applications for construction of a

7    wireless base station must include the information set forth in section 10 of the Siting

8    Guidelines.  The Siting Guidelines set forth a location preference system for the types of

9    buildings to be used for wireless installations.  See Exh. A48.

10        On January 15, 2002, MetroPCS applied for a CUP to construct a base station at the

11   5200 Geary site.  The site is a private commercial building, used as a parking garage with

12   ground-floor retail space, occupying the entire blockface along Geary Boulevard.  The site

13   is located within a Moderate Scale Neighborhood Commercial (NC-3) Zoning District, which

14   permits installation of wireless facilities upon the approval of a CUP.

15        MetroPCS sought to mount six panel antennas on an existing light pole on the roof

16   of the 42-foot tall parking garage, and to place related equipment cabinets behind an

17   existing wall on the roof.  The antennas were to be mounted on the light pole a total of

18   approximately 53 feet above the sidewalk grade.  Each antenna is approximately 2 inches

19   thick, 6 inches wide, 5 feet long, and would be painted to match the garage.

20        MetroPCS' application came before the Planning Commission at a duly noticed

21   public hearing on April 18, 2002 at which time the Planning Commission heard testimony in

22   support of and in opposition to MetroPCS' application for a CUP.  The Planning

23   Commission unanimously voted to approve MetroPCS' CUP application, and determined

24   that the Geary site was necessary and/or desirable for, and compatible with, the

25   surrounding neighborhood, pursuant to section 303 of the Planning Code.  See Exh. 90 at

26   G020-023.

27        On May 20, 2002, a timely appeal of the Planning Commission's decision was filed.

28

United States District Court

For the Northern District of California

1   On June 17, 2002, the Board held a public hearing on the appeal, at which time the Board

2   heard testimony in support of and in opposition to the Planning Commission's decision to

3   grant the CUP.  During the hearing on the appeal, the Board voted ten to zero to uphold the

4   appeal, thereby disapproving the Planning Commission's decision to grant the CUP.

5           On June 24, 2002, the Board by a vote of ten to zero adopted written findings

6   upholding the appeal of the Planning Commission's decision.  See Exh. 18.  Among other

7   things, the Board's written findings stated:  that MetroPCS' proposed facilities were not

8   "necessary;" that there was no need for "further wireless service" in the neighborhood since

9   other wireless providers were already serving the area; that the proposed six panel

10  antennas would "constitute a visual and industrial blight" for the neighborhood; that the

11  project would be detrimental to existing housing and neighborhood character; that the

12  project would not preserve and enhance the City's supply of affordable housing; and that

13  the proposed project would not add to the City's earthquake preparedness.  Id.

14          D.      Other CUP Applications Before the City

15          The Planning Commission has granted CUP applications filed by MetroPCS on 18

16  other occasions.  In each instance, the Planning Commission found that MetroPCS'

17  proposed wireless facility was necessary or desirable for, and compatible with, the

18  surrounding neighborhood or community.  The eighteen locations are as follows: (a) 2700

19  45th Avenue; (b) 2645 Ocean Avenue; (c) 4610 Mission Street; (d) 2400-2418 14th

20  Avenue; (e) 2155 18th Avenue; (f) 20 Woodside Avenue; (g) 2696 Geary Boulevard; (h)

21  965 Sutter Street; (i) 1101-1123 Fillmore Street; (j) 510 Frederick Street; (k) 2000 Van

22  Ness Avenue; (l) 965-985 Geneva Avenue; (m) 1844-1850 Irving Street; (n) 1000 Ocean

23  Avenue; (o) 135 Sanchez Street; (p) 1701 Jerrold Avenue; (q) 434-450 Harrison Street;

24  and (r) 2601 Mission Street.

25          The Planning Commission has also granted CUP applications for other wireless

26  carriers seeking to install facilities in order to provide personal wireless services.  The

27  locations of some of the properties where such permits have been granted that are within

28

7

United States District Court

For the Northern District of California

1    one and a half miles of the Geary site are as follows: (a) 3773 Sacramento Street (two

2    facilities); (b) 3838 California Street; (c) 2195 Fulton Street; (d) 2255 Hayes Street; (e) 510-

3    520 Frederick Street; (f) 5000 Geary Boulevard; (g) 4141 Geary Boulevard; (h) 4131 Geary

4    Boulevard; (i) 417 31st Avenue; (j) 679 24th Avenue; (k) 1844 Irving Street; (l) 1501 Lincoln

5    Way; (m) 246-260 Judah Street; (n) 336-350 Judah Street; (o) 1300 26th Avenue; (p) 3030

6    Judah Street; (q) 1515-1541 9th Avenue; (r) 6-8 Locksley Avenue; and (s) 2200 Hayes

7    Street.  See Exhs. A24 - A41.

8         The Planning Commission has denied at least one CUP application for another

9    wireless carrier, for a site located at 401 University Street.  See Exh. A42.  The Planning

10   Commission found that the proposed facility was not necessary or desirable for, and

11   compatible with, the surrounding neighborhood or community.  Id.

12        On several occasions, appeals from Planning Commission decisions granting

13   various wireless carriers' CUP applications, including MetroPCS', have also been filed with

14   the Board.  The parties stipulated that the Board has heard at least 15 such appeals.

15        Of those 15 appeals, the Board voted to overturn the Planning Commission's

16   decision to grant CUP applications – thereby denying conditional use permits – on 11

17   occasions.  The properties associated with these denials are as follows: (a) 389 9th Avenue

18   (aka 378 10th Avenue); (b) PG&E Transformer Station (3400 block of 19th Street); (c)

19   2444-2454 Noriega Street (MetroPCS application); (d) 3725 Buchanan Street (aka 3727

20   Buchanan Street); (e) 2599 Lombard Street; (f) 3372-3378 Mission Street; (g) 100 Felton

21   Street; (h) 1017 Ocean Avenue; (i) 2801-2825 California Street; (j) 2489-91 Washington

22   Street; and (k) 3224-3252 Pierce Street (MetroPCS applications).  In each of these

23   decisions, the Board found that the proposed conditional use was not necessary or

24   desirable for, and compatible with, the surrounding neighborhood or community.  See Exhs.

25   A1, A3 - A6, A10 - A15.

26        The Board upheld the Planning Commission's decision to grant conditional use

27   permits, by contrast, on 4 occasions.  The properties associated with the Board's decision

28

1    on these occasions are as follows: (a) 501-03 Laguna Street; (b) 2001 37th Avenue (aka

2    Rivera Street); (c) 417 31st Avenue; and (d) 3224-3252 Pierce Street (Sprint application).

3    Each of the Board's decisions included a finding that the proposed conditional use was

4    necessary or desirable for, and compatible with, the surrounding neighborhood or

5    community. See Exhs. A2, A7 - A9.

6                        **FINDINGS OF FACT AND CONCLUSIONS OF LAW**

7           MetroPCS asserts three claims against the City as a result of the City's denial of its

8    CUP application for the 5200 Geary site: (1) that the City has prohibited or effectively

9    prohibited the provision of wireless services, in violation of 47 U.S.C. §§ 332(c)(7)(B)(i)(II);

10   (2) that the City has unreasonably discriminated against it in violation of 47 U.S.C. §

11   332(c)(7)(B)(i)(I); and (3) that the City has violated the Equal Protection Clause.

12          The latter claim is brought pursuant to 42 U.S.C. § 1983.  The first two claims are

13   brought under the Telecommunications Act of 1996 (the "TCA"), a statute intended to aid in

14   the advancement of telecommunications services by "opening all telecommunications

15   markets to competition...".  See Sprint Spectrum, L.P. v. Willoth, 176 F.3d 630, 637.  To

16   that end, the TCA seeks to preserve local zoning authority, while at the same time limiting

17   and regulating state and local governments' authority over the construction of wireless

18   facilities. Id.

19          A.     Effective Prohibition Claim

20          The TCA provides:  "[t]he regulation of the placement, construction, and modification

21   of personal wireless service facilities by any State or local government or instrumentality

22   thereof ... shall not prohibit or have the effect of prohibiting the provision of personal

23   wireless services." See 47 U.S.C. §§ 332(c)(7)(B)(i)(II).  Here, MetroPCS can prove that

24   the City has prohibited it from providing wireless services by satisfying a two-part test.

25   First, it must prove that it has been "prevented from filling a significant gap in its own

26   service coverage." See MetroPCS, Inc. v. City and County of San Francisco, 400 F.3d

27   715, 733 (9th Cir. 2005).  Second, it must prove that the manner in which it proposes to fill

28

United States District Court
For the Northern District of California

the significant gap in service "is the least intrusive on the values that the denial sought to serve." Id. at 734-35.

> 1.    Existence of a Significant Gap in MetroPCS' Coverage

Significant gap determinations are "extremely fact-specific inquiries that defy any bright-line legal rule." See MetroPCS, 400 F.3d at 733.  To that end, the parties introduced propagation maps, drive test data, switch data, and/or economic data in support of their arguments regarding the existence or non-existence of a significant gap.  The court summarizes this evidence, prior to undertaking a legal analysis of the significant gap issue in light of the evidence.

> a.    trial evidence

Generally, in order to test the performance of a cellular network, there are two primary tools that are employed: propagation maps, and drive tests.  Propagation maps are relatively sophisticated computer models that predict signal strength throughout the area in question.  Drive tests, by contrast, are empirical rather than predictive.  They are conducted by using sensitive RF scanning and GPS equipment which is attached to a vehicle that is driven throughout a given area in order to record actual signal strength data.  The drive test data is then used to create a map illustrating actual signal strength at locations throughout the area driven.  Both propagation maps and drive tests are widely used throughout the wireless industry and are generally recognized as reliable and accurate.

Signal strength, in turn, is measured by the level of "dBm"[3] that is present in a given location.  Differing dBm levels correspond to the different standards of coverage available on a network.  For example, MetroPCS has adopted a level of -76 dBm to achieve an in-building coverage standard on its network, a level of -91 dBm to achieve in-vehicle coverage, and a level of -98 dBm to achieve outdoor coverage.  See Exh. 30.  Generally speaking, the larger the dBm number, the weaker the signal strength.

The precise setting of dBm levels derives from what is called a "link budget."  A link

---

[3]    "dBm" refers to a decibel relative to a megawatt of power.

United States District Court
For the Northern District of California

United States District Court

For the Northern District of California

1  budget refers to the process through which a carrier analyzes the signal losses and gains

2  that occur in a two-way communication between an originating cellular handset and a given

3  cell site.  This analysis determines the dBm – or signal strength –  level needed to achieve

4  a particular coverage standard (e.g., in-building or otherwise).  The dBm levels adopted by

5  a carrier generally determine the number of cell sites that will be necessary in order for the

6  carrier to achieve its desired coverage.  There are no specific or uniform coverage

7  standards or signal levels for the wireless industry.  Accordingly, standards can and do vary

8  among the different wireless carriers.

9                                         i.      MetroPCS' Evidence

10         MetroPCS' RF engineering department prepared an internal propagation map

11  depicting wireless coverage in the Richmond district on July 18, 2005.  See Exh. 82.  The

12  map depicts in green, yellow, and red the varying levels of coverage available in the

13  Richmond district.  The green portions of the map correspond to areas in which in-building

14  coverage is available (as well as in-vehicle and outdoor coverage), the yellow portions to

15  areas in which in-vehicle coverage is available (as well as outdoor coverage), and the red

16  portions to areas in which only outdoor coverage is available.  MetroPCS' propagation map

17  indicates that in-vehicle coverage is generally available in the heavily populated areas of

18  the Richmond district, but that there is a widespread lack of in-building coverage that is

19  available in the same area.  Id.

20         MetroPCS also introduced the results of a drive test that was conducted by Gordon

21  Spencer, of Hillpeak Systems.  See Exh. 30.  The Hillpeak drive test measured signal

22  strength for the 1 mile area surrounding the 5200 Geary site, and took into account all cell

23  sites that MetroPCS presently has online in the area.  From the drive test data collected,

24  Mr. Spencer prepared a drive test map, in which he used the same dBm coverage

25  standards as did MetroPCS to show outdoor service, in-vehicle service, and in-building

26  service.  See Exhs. 30, 82.  MetroPCS advised Hillpeak as to the dBm coverage standards

27  employed internally by MetroPCS.  The Hillpeak results depict MetroPCS' available

28

                                                    11

United States District Court

For the Northern District of California

1    coverage levels according to the same color coded scheme utilized in MetroPCS'

2    propagation map.  See id.  The Hillpeak drive test results are generally consistent with

3    MetroPCS' internal propagation map, although some inconsistencies are present.  In sum,

4    the drive test results illustrate the widespread presence of in-vehicle coverage within the

5    Richmond district, and a general lack of in-building coverage.

6         Other evidence corroborates the lack of in-building coverage.  Michael Mackiewicz,

7    a specialist in RF engineering consulting, was employed as an expert by MetroPCS to

8    independently evaluate MetroPCS' coverage within the Richmond district.  Mr. Mackiewicz

9    created his own link budget to arrive at an independent formulation of dBm coverage

10   thresholds.  His results were generally more conservative than MetroPCS' coverage

11   thresholds, although the dBm standard he established for in-building coverage differed from

12   MetroPCS' standard by only 1 dBm.  Mr. Mackiewicz admitted, however, that he based his

13   link budget on a 90% probability of coverage, and he further admitted that lower probability

14   goals would in turn lower the coverage thresholds established.  Notwithstanding, Mr.

15   Mackiwiecz' established coverage thresholds were as follows: a level of -75 dBm for in-

16   building coverage, a range of -76 to -85 dBm for in-vehicle coverage, and a range of -86 to

17   -93 dBm for outdoor coverage.  See Exh. 79.  Based on this data, Mr. Mackiewicz

18   produced propagation maps (one with the proposed 5200 Geary site included, and one

19   without) and drive test results.  Id.

20        According to Mr. Mackiewicz' propagation map showing the existing coverage within

21   the Richmond district, there is a widespread lack of in-building coverage (reflected in green)

22   throughout the more heavily populated areas of the Richmond district.  See Exh. 79, Plot 1.

23   Similarly, Mr. Mackiewicz' mapping of the HillPeak drive test data (using his independent

24   coverage thresholds) confirms the lack of in-building coverage in this area.  See Exh. 79,

25   Plot 4.

26        Mr. Mackiewicz testified that in his assessment, and based on his review of all

27   applicable coverage data, there is a gap in MetroPCS' in-building coverage of

28

United States District Court

For the Northern District of California

1   approximately 5.3 square miles.  If the 5200 Geary site were to be factored into his

2   analysis, Mr. Mackiwiecz admits that it would not fill the gap in its entirety, but rather, would

3   fill 1 square mile of the gap.  See Exhs. A19, 79 Plot 2.  When questioned as to other

4   available alternatives for filling the gap, Mr. Mackiewicz testified that the only remedy is the

5   addition of the proposed cell site.  An additional site on a high tower, such as the Sutro

6   Tower located in the vicinity, would not fill the gap, and neither would an increase in power

7   to MetroPCS' existing cell sites.  This testimony was further corroborated by Mr. Noceto

8   and Mr. Hatfield.  Both men testified that the existing MetroPCS network is already fully

9   optimized, and that MetroPCS cannot use existing cell sites to fill the gap in coverage in the

10  Richmond district.

11      MetroPCS also introduced "switch" data evidence.  This refers to the data gathered

12  by wireless carriers at the switch, which is comprised of data that records network failures.

13  The data is used by RF engineers to analyze network performance.  Mr. Mackiewicz

14  reviewed and analyzed MetroPCS' switch data, specifically looking at the dropped call data

15  for areas in close proximity to the proposed 5200 Geary site.  The data demonstrates 25

16  times as many dropped calls per square mile in areas with signal strength sufficient for in-

17  building coverage than in areas without.  Mr. Mackiewicz' analysis of MetroPCS' switch

18  data was incomplete, however: he testified that although his analysis appears to be based

19  on data recorded for 112 phone calls, he is unaware how long the time period spanned in

20  which the 112 calls were made, how many total calls were made in order to arrive at the

21  112 dropped calls, or what the reason for the dropped calls was (e.g., RF signal levels,

22  etc.).

23      Finally, MetroPCS introduced what it termed "economic" data – specifically,

24  evidence of MetroPCS' penetration rates in the Richmond district.  See Exhs. 100, 125.

25  The penetration rates in the Richmond district, allocated by corresponding zip code, are

26  1.7% (for zip code 94118) and 1.9% (for zip code 94121), compared to a higher penetration

27  rate of 4.6% overall for MetroPCS citywide.  See id.  But since the Richmond district is

28

13

United States District Court

For the Northern District of California

1    populated by MetroPCS' target demographic group, and furthermore since the same rate

2    plans and policies are in effect throughout the city, MetroPCS believes that the only

3    explanation for the fact that its penetration rates in the Richmond district are not higher is

4    that a significant gap in coverage exists.  MetroPCS failed to adequately explain, however,

5    the fact that other zip codes corresponding to different city neighborhoods demonstrated

6    equally low penetration rates, or the precise nature of the connection between a

7    purportedly low penetration rate and quality of wireless coverage.

8                              ii.      The City's Evidence

9          The City introduced two primary forms of evidence regarding the existence or non-

10   existence of a significant gap: call test data and drive test data.  It did so through the

11   testimony of the City's expert, Jonathan Kramer, and his associate, Steve Allen.

12         Mr. Kramer and Mr. Allen conducted two phone call tests in the Richmond district on

13   two separate days, one of which was designed to measure MetroPCS' in-building coverage

14   in the Geary Boulevard Area.  See Exh. 62.  The following protocol was employed:  Mr.

15   Kramer sent Mr. Allen to the Richmond district with a MetroPCS cell phone, and instructed

16   Mr. Allen to make phone calls from certain locations within the Richmond district that Mr.

17   Kramer pre-determined with reference to applicable coverage and propagation maps.  Mr.

18   Kramer testified that he purposefully sent Mr. Allen to low signal areas, or areas in which

19   MetroPCS claims that no in-building coverage is available, in order to collect in-building call

20   data and thereby assess signal strength.  Mr. Allen would then proceed to those locations,

21   and make phone calls to Mr. Kramer from those locations.  Mr. Kramer recorded all calls

22   received from Mr. Allen, along with notes regarding the type of signal quality received from

23   the various locations.  See Exhs. A43, A44-1.

24         Per Mr. Kramer's instructions, if Mr. Allen successfully completed a call on the first

25   attempt from deep inside a particular building (usually a store), he would move on to

26   another location.  In those instances where Mr. Allen could not successfully complete the

27   first call from deep within a building, Mr. Kramer instructed Mr. Allen to make additional

28

                                             14

United States District Court

For the Northern District of California

1   calls from the same building while gradually moving toward the perimeter.  At times when

2   Mr. Allen could not successfully complete the first call from deep inside a particular

3   building, he would be able to successfully complete a subsequent call from the same

4   building as he moved closer to the perimeter, while at other times all of Mr. Allen's calls

5   from one building were unsuccessful. See Exhs. 62, A44-1.

6       Mr. Kramer had Mr. Allen place approximately 35 calls in conducting the in-building

7   test.  Of those 35 calls, 23 failed to connect to the network, or were otherwise garbled,

8   blocked or dropped.  This correlates with an approximate 65% failure rate – a rate that Mr.

9   Mackiewicz testified would be interpreted to mean that no in-building coverage exists, from

10  an RF engineering perspective.  Although Mr. Kramer explained that the 65% failure rate

11  might be artificially high because of the manner in which he designed and conducted the in-

12  building call test, Mr. Kramer nonetheless admitted that this failure rate is the highest he

13  has ever experienced in conducting more than 500 phone call tests.  He also conceded that

14  he is unaware of any wireless carrier that would find a 65% failure rate acceptable.  Indeed,

15  he even conceded that he himself might change wireless carriers if his own cell phone did

16  not complete in-building calls 65% of the time.

17      In addition to the phone call test, Mr. Kramer also conducted his own drive test.  See

18  Exh. 57 at 57-6.  He used his own vehicle and equipment to collect signal strength data in

19  the vicinity of the 5200 Geary site.  See Exh. 57.  Although he testified that he ended up

20  relying on Hillpeak's drive test data rather than his own since the two sets of data were

21  consistent, Mr. Kramer's own drive test results confirm a general lack of in-building

22  coverage.  See id. at 57-6.  The test results are illustrated using a different color scheme

23  than that utilized by MetroPCS', and the coverage thresholds noted on the results are also

24  different than MetroPCS.  Id.  But even accounting for these differences, the results

25  indicate a significant area that lacks in-building coverage.  For example, Mr. Kramer

26  testified that in his experience, he has seen carriers use varying coverage thresholds for in-

27  building (and in-vehicle) coverage, ranging anywhere between -65 dBm and dBm levels in

28

15

United States District Court

For the Northern District of California

the -80s.  Even using this range, however, which is denoted on his drive test map in green, blue and yellow, there are areas of coverage spanning numerous contiguous blocks that are lacking these coverage levels, and are instead portrayed in only red or black, representing coverage levels ranging from -85 dBm to greater than -95 dBm.  Accordingly, Mr. Kramer's drive test results are consistent with MetroPCS' results in demonstrating a widespread lack of in-building coverage.

> b.    significant gap analysis

The question remains whether this lack of in-building coverage is sufficient to constitute a "significant gap" for purposes of MetroPCS' effective prohibition claim.

Preliminarily, the parties dispute how any significant gap is to be measured, and what level of coverage – outdoor, in-vehicle, or in-building – should be taken into account in determining a significant gap.  Specifically, the parties dispute whether consideration of in-building coverage is appropriate for consideration as part of the significant gap analysis.

There is a lack of controlling authority on this question, and a review of the available persuasive authority reflects that the question has never been decisively determined.  Nonetheless, careful reading of existing cases that contain a significant gap analysis persuades the court that any analysis should include consideration of a wireless carrier's in-building coverage.  See, e.g., Sprint Spectrum, 176 F.3d at 643 (measuring significant gap with regard to both in-vehicle *and* in-building coverage); U.S.C.O.C. of New Hampshire v. Town of Dunbarton, 2005 WL 906354 (D. N.H. 2005) (holding that in-building coverage is relevant for purposes of evaluating a significant gap under the TCA); see also American Cellular Network Co., LLC v. Upper Dublin Township, 203 F. Supp. 2d 383, 391 (E.D. Pa. 2002) (evaluating evidence of significant gap that included propagation maps illustrating in-building coverage).  Indeed, Sprint Spectrum embraced the notion that in-building coverage should be included in any significant gap analysis by stating that *de minimis* coverage holes are those that are limited in number and size, such as "the interiors of buildings in a sparsely populated rural area, or confined to a limited number of houses or spots as the

16

United States District Court
For the Northern District of California

1   area covered by buildings increases."  See 176 F.3d at 643.  Accordingly, where coverage

2   holes are large or frequent in number and size, and extend to the interior of buildings in

3   urban areas or to a significant number of residences in well-populated areas, such

4   coverage holes *are* actionable under the TCA.  See also Nextel Partners, Inc. v. Town of

5   Amherst, 251 F. Supp. 2d 1187, 1196 (W.D. N.Y. 2003) (finding effective prohibition under

6   the TCA and noting that evidence showed that significant gap was "clearly substantial and

7   not limited to rural areas or the interior of buildings in sparsely populated areas"); American

8   Cellular, 203 F. Supp. 2d at 389 (finding that significant gap existed and stating that scope

9   of any significant gap is dependent on "how many users are affected by the gap, or how

10  large an area is in the gap").

11      The soundness of this conclusion is supported by the testimony and evidence

12  introduced at trial.  All witnesses qualified in the field testified that wireless carriers

13  consistently build their networks to an in-building standard.  Even Mr. Kramer, the City's

14  expert, testified that all carriers attempt to build to an in-building standard.  Moreover,

15  MetroPCS' witnesses, many of whom have personal experience working for competing

16  wireless carriers, persuasively testified that current customers expect in-building coverage

17  from their wireless carriers.

18      Having decided that in-building coverage may appropriately be considered as part of

19  the significant gap analysis, the question to be answered by the court is whether, in this

20  case, MetroPCS has in fact demonstrated the existence of a significant gap with respect to

21  outdoor, or in-vehicle, or in-building coverage.  On balance, the court finds that the

22  propagation maps, drive test results, and/or call test results introduced by both parties

23  support the existence of a gap that spans a minimum of several blocks in the Richmond

24  area (which Mr. Mackiewicz calculated to be 5.3 square miles), throughout which no

25  reliable in-building coverage is present.  See Exhs. 30, 57, 62, 79, 82, A19, A43, A44-1.

26  Although the diagraming of the results appears different depending on the individual

27  conducting the given tests, neither party truly disputes either that (1) the most unreliable

28

17

United States District Court
For the Northern District of California

1  coverage experienced by MetroPCS in the Richmond district is with respect to in-building

2  coverage, or (2) the extent of the area covered by that gap in in-building coverage is

3  widespread.  Indeed, Mr. Kramer testified that he would consider a gap of more than 2

4  blocks to be significant, a geographic scope more than evident on his own drive test map

5  depicting MetroPCS' in-building coverage.  See Exh. 57.  Even the results of Mr. Kramer's

6  phone call test, which the court does not find to be as scientifically valid or reliable as the

7  evidence introduced by MetroPCS, prove the existence of a significant gap:  according to

8  the data he presented, the rate for garbled, dropped, or blocked calls in-building was

9  approximately 65%, a failure rate which he himself testified might induce *him* to switch

10 carriers.  In sum, the court finds that MetroPCS has proven that there is, in fact, a

11 widespread gap in its in-building coverage in the Richmond district.

12        Since MetroPCS has proven a significant gap with respect to in-building coverage, it

13 is unnecessary for the court to examine whether MetroPCS has also sufficiently proven a

14 gap in either in-vehicle or outdoor coverage.  In short, the whole of the evidence supports

15 MetroPCS' conclusion that its in-building coverage is unreliable, inconsistent and

16 insufficient to support its provision of services throughout the Richmond district.

17        In so holding, the court is mindful that the TCA does not guarantee MetroPCS

18 seamless coverage in every location within the Richmond district.  Indeed, courts have

19 expressly recognized that the presence of "dead zones," or pockets in which coverage

20 does not exist, are not actionable for purposes of arguing effective prohibition claims under

21 the TCA.  See MetroPCS, 400 F.3d at 733 ("the TCA does not guarantee wireless service

22 providers coverage free of small 'dead spots'"); see also 360º Communications Co. v. Bd.

23 of Supervisors, 211 F.3d 79, 87 (4th Cir. 2000) (same); Second Generation Prop. v. Town

24 of Pelham, 313 F.3d 620, 631 (1st Cir. 2002) (same).    Here, however, MetroPCS has

25 proven that its lack of in-building coverage within the Richmond district is widespread, and

26 qualifies as more than mere "dead spots."

27                2.        Least Intrusive Means

28
                                        18

United States District Court

For the Northern District of California

1    Having proven the existence of a significant gap in its coverage, MetroPCS must

2  next prove that the 5200 Geary site is the "least intrusive" on "the values that the denial [of

3  the CUP] sought to serve."  See MetroPCS, 400 F.3d at 734, quoting APT Pittsburgh Ltd.

4  P'ship v. Penn Township Butler County, 196 F.3d 469, 480 (3d Cir. 1999).  Unlike its

5  showing with respect to the former, however, MetroPCS fails to adequately prove the latter.

6    The "least intrusive means" standard contemplates that a wireless provider will have

7  undertaken a "meaningful comparison of alternative sites" in order to identify "the best

8  solution for the community" in selecting a site for a proposed facility.  See MetroPCS, 400

9  F.3d at 735.  The Third Circuit, in Penn Township, also construed this standard to include

10  evidence that a provider "has considered less sensitive sites, alternative system designs,

11  alternative tower designs, placement of antennae on existing structures, etc."  See Penn

12  Township, 196 F.3d at 480.

13    Here, MetroPCS introduced witness testimony and evidence of the alternative site

14  analysis report that it submitted in connection with its original CUP application in regards to

15  the Mar Commercial building.   See Exh. A23.  While this evidence is sufficient to

16  demonstrate that MetroPCS reviewed alternative sites and conducted an analysis thereof

17  before ultimately deciding upon the 5200 Geary site, MetroPCS has failed to prove that this

18  comparison of alternative sites was truly "meaningful" or that it identified "the best solution

19  for the community."

20    For example, in the site analysis report, the 5200 Geary site was originally identified

21  as "not technologically feasible."  Id. at G156.  Ms. Nahmanson testified that the primary

22  reason for not finding the 5200 Geary site feasible had to do with height concerns – that the

23  5200 Geary site was approximately 40 feet tall, whereas the Mar Commercial building was

24  over 80 feet tall, and therefore more ideal from an RF engineering perspective.  However,

25  she also testified that, once the Mar Commercial building CUP application had to be

26  withdrawn, the 5200 Geary site became technologically feasible.  When asked whether this

27  did not imply that MetroPCS used the term "technologically feasible" to denote preferences

28

United States District Court
For the Northern District of California

rather than absolute requirements, Ms. Nahmanson refused to characterize the term as such, instead re-casting the phrase as a scientific-based one.  Nonetheless, Ms. Nahmanson's testimony cast doubt upon the comparison and conclusions reached in the alternative site analysis report.  For the obvious question becomes whether the remaining 17 sites listed in MetroPCS' original application – which were all determined not to be "technologically feasible" – could also have *become* technologically feasible, thereby also becoming lesser intrusive means of filling MetroPCS' significant gap.  See Exh. A23 at G154-157.  As to this question, MetroPCS offered little or no proof.  It relied only on evidence that it believed that the 5200 Geary site was the least intrusive alternative, but did not affirmatively demonstrate, with evidence extrinsic to the alternative site analysis report, that the remaining 17 sites identified were truly not "technologically feasible."

Moreover, Ms. Nahmanson's testimony highlights another problem with respect to MetroPCS' attempt to use the site analysis report as evidence on the least intrusive element.  In essence, MetroPCS seeks to introduce the alternative site report as evidence that it engaged in a meaningful comparison of alternative sites to identify the best community solution.  However, this is the standard employed in the court's analysis of the effective prohibition claim now that MetroPCS' claim is before the court, and is not necessarily the same standard that was employed by MetroPCS when it undertook the alternative site analysis.  Indeed, as Ms. Nahmanson testified, the alternative site analysis took place as part of the effort by MetroPCS' RF engineers and siting experts to determine the best possible cell site for MetroPCS from an engineering perspective.  Put another way, that analysis was aimed at finding the best site from which to provide greater service coverage, not necessarily at finding the least intrusive means with respect to identifying the best solution or location for the community.  Accordingly, and for the additional reasoning discussed in connection with Ms. Nahmanson's definition of 'technological feasibility,' the value of the site analysis report in proving that the required "meaningful comparison" has taken place, is suspect.

It is true that Ms. Nahmanson also testified that MetroPCS took community needs into account in ultimately determining that the 5200 Geary site was the best alternative, a fact that the court credits.  However, it is undisputed that, by the time consideration of the appeal before the Board took place, the community opposition to the 5200 Geary site was significant, and a marked increase from that faced while MetroPCS was going through the application process.  This begs the question which time frame governs the court's analysis of the least intrusive element – the time of the CUP application filing, or the time of the local government's final decision on the merits of any such application.  The Ninth Circuit's decision in MetroPCS does not explicitly address this question.  However, in view of the non-temporal language of the statutory provision setting forth the effective prohibition claim and the fact that the relief MetroPCS seeks is *from* the City's final decision on the merits of its CUP application, the court holds that the time frame that governs application of the least intrusive means standard is the time in which the municipal or local government in question makes its final determination as to the merits of a permit application.  See 47 U.S.C. §§ 332(c)(7)(B)(i)(II) ("any State or local government ... [s]hall not prohibit or have the effect of prohibition the provision of personal wireless services").  Applying this standard, and in view of the substantial community opposition to the 5200 Geary site before the Board, MetroPCS has not, and cannot, prove that the 5200 Geary site was truly the least intrusive with respect to the "the best solution for the community."  See MetroPCS, 400 F.3d at 735.

For all the above reasons, the court concludes that MetroPCS has failed to prove that the 5200 Geary site was truly the least intrusive means of filling its significant gap.  Accordingly, MetroPCS has also failed to prove that the City's denial of its CUP application prohibited or effectively prohibited it from providing wireless services in violation of 47 U.S.C. §§ 332(c)(7)(B)(i)(II).

B.     Unreasonable Discrimination Claim

The TCA's proscription against unreasonable discrimination provides that:  "[t]he regulation of the placement, construction, and modification of personal wireless service

United States District Court

For the Northern District of California

1    facilities by any State or local government or instrumentality thereof – (I) shall not

2    unreasonably discriminate among providers of functionally equivalent services." See 47

3    U.S.C. § 332(c)(7)(B)(I).  In interpreting this provision, the Ninth Circuit has held that "some

4    discrimination among providers of functionally equivalent services is allowed.  Any

5    discrimination need only be reasonable." MetroPCS, 400 F.3d at 727; see also Sprint

6    Spectrum v. Willoth, 176 F.3d 630, 638 (2d Cir. 1999).  For example, discrimination based

7    on "traditional bases of zoning regulation," such as "preserving the character of the

8    neighborhood and avoiding aesthetic blight" are reasonable and permissible. See

9    MetroPCS, 400 F.3d at 727.  Accordingly, in order to prevail on this claim, the Ninth Circuit

10   held that "providers alleging unreasonable discrimination must show that they have been

11   treated differently from other providers whose facilities are 'similarly situated' in terms of the

12   'structure, placement or cumulative impact' as the facilities in question." MetroPCS, 400

13   F.3d at 727.

14       In setting forth the 'similarly situated' standard in MetroPCS, the Ninth Circuit

15   provided helpful insight as to what proof of this standard might entail.  In reversing this

16   court's grant of summary judgment to the City on this claim, the Ninth Circuit based its

17   decision in part on the City's failure to prove that a "systematic comparison of the sites in

18   question" had taken place. See MetroPCS, 400 F.3d at 729.  It suggested that a

19   systematic comparison might be proven by the introducion of photo simulations comparing

20   the proposed facility to existing sites. Id.  Given the lack, however, of any "detailed inquiry

21   into the similarity of [the] existing facilities to the proposed MetroPCS facility in terms of

22   'structure, placement or cumulative impact,'" the Ninth Circuit held there was simply "no

23   conclusive evidence satisfying the "similarly situated" element of MetroPCS' unreasonable

24   discrimination claim. Id.

25       Plaintiff reads into the MetroPCS decision a suggestion that the City bears the

26   burden of proof on the 'similarly situated' element. See MetroPCS, 400 F.3d at 729

27   (stating, in reference to the Board's argument that competing facilities were more ideally

28

22

United States District Court
For the Northern District of California

1    located, that "the record contains no systematic comparison of the sites in question").  This

2    issue was not addressed in any detail by the parties at trial or in their proposed conclusions

3    of law.  The above language, however, is inconclusive.  While it seems to suggest, as

4    plaintiff argues, that the City bears the burden of proving that a systematic comparison of

5    sites was undertaken, the more logical inference is that this language referred to the City's

6    burden in seeking summary judgment, and that ultimately, as with most causes of action,

7    the burden of proof lies with the plaintiff.  There is simply nothing in the MetroPCS opinion

8    that suggests that the court intended to shift the burden of proof normally borne by plaintiff

9    to prove a defendant's violation of the TCA.  This conclusion is supported by another

10   passage contained in the MetroPCS opinion, wherein the Ninth Circuit states that

11   "providers ... *must show* that they have been treated differently from other providers whose

12   facilities are 'similarly situated.'" Id. at 727.

13         In sum, MetroPCS must demonstrate here that its proposed facility at 5200 Geary is

14   similarly situated to other providers in terms of structure, placement or cumulative impact,

15   and that MetroPCS has been subjected to differential treatment by the City.  For the

16   reasons below, MetroPCS has failed to meet this burden.

17              1.    Trial Evidence

18         The parties submitted competing expert testimony on whether the proposed 5200

19   Geary site is similarly situated to other carriers' sites approved by the City, and whether

20   differential treatment occurred.

21         MetroPCS' expert, Jennifer Estes, submitted an analysis and report comparing cell

22   sites approved by the City before and after the City's denial of MetroPCS' CUP application

23   for the proposed 5200 Geary site.  See Exh. 83.  According to her testimony and report, the

24   City has granted at least 23 CUPs to other wireless carriers to install cell sites within one

25   and a half miles of the 5200 Geary site.

26         In Ms. Estes' opinion, the proposed 5200 Geary site is similarly situated to and as

27   unobtrusive as the other City-approved cell sites within the Geary vicinity.  She testified that

28

United States District Court

For the Northern District of California

1    the proposed 5200 Geary site is similar in placement, structure, and cumulative impact to

2    the other cell sites approved by the City, and that given these facts, the City unreasonably

3    discriminated against MetroPCS in denying its CUP application with respect to the 5200

4    Geary site.  Ms. Estes based her testimony and report on her familiarity with the Siting

5    Guidelines and the location preference system set forth therein, her review of pertinent

6    legal authority, and her surface review of other CUP applications that were approved by the

7    City.

8         In forming her opinion, Ms. Estes did not review any of the evidence actually

9    submitted as part of the CUP applications for the other sites identified in her report.  She

10   did not review any technical specifications, photo simulations, or coverage maps.  She also

11   did not consider the amount of community opposition, if any, expressed by the

12   neighborhood with respect to the applications for conditional use permits at those other

13   sites, and/or the coverage needs of the carriers that had applied for conditional use permits

14   at such sites.  Nor did her analysis take into account whether the sites at issue were

15   "necessary," per the requirements of San Francisco Planning Code § 303.

16        In response, the City introduced their expert Mr. Lawrence Badiner, who testified

17   that Ms. Estes' analysis also failed to consider adjacent users to sites, or the topography of

18   sites at issue – all critical factors in assessing structure, placement, and cumulative impact.

19   Mr. Badiner further testified that the location preference system set forth in the Siting

20   Guidelines is used by the Planning Department to determine whether or not a conditional

21   use permit is required, not whether or not an application for a conditional use permit should

22   be granted in the final analysis.  Thus, the preference number assigned to a particular

23   building under the Siting Guidelines is merely a starting point for determining the potential

24   suitability of a proposed wireless facility and not a conclusive factor.  Mr. Badiner testified

25   that the City – including the Planning Department, the Planning Commission and the Board

26   – carefully consider all of the information presented to it, including schematic or

27   architectural diagrams, photo simulations, coverage maps, and community response, in

28

24

United States District Court

For the Northern District of California

1   determining whether or not to grant or deny an application for a conditional use permit to

2   construct a wireless facility.

3          Indeed, Mr. Badiner testified that it is section 303 of the Planning Code rather than

4   the Siting Guidelines that sets forth the governing requirements for issuance of a CUP –

5   i.e., that the CUP be "necessary" and "desirable."  The burden is on the CUP applicant to

6   prove that this standard has been met.  To the extent that the Siting Guidelines enumerate

7   additional factors and/or preferences, they were never intended to supplant the

8   fundamental requirements of section 303, but were meant to supplement, and provide

9   guidance in evaluating, those requirements.  Mr. Badiner testified that in his opinion,

10  MetroPCS' CUP application was not out of the ordinary, was evaluated under section 303

11  of the Planning Code, and was not treated any differently by the City than any other

12  provider's.

13                 2.     Analysis

14         MetroPCS relies almost exclusively on Ms. Estes' testimony, analysis, and report for

15  support of its unreasonable discrimination claim.  This evidence, however, is insufficient to

16  satisfy MetroPCS' burden of showing that it is 'similarly situated' to other providers in terms

17  of structure, placement, and cumulative impact, and that it suffered differential treatment.

18         In order to demonstrate that it is similarly situated to other providers in terms of

19  structure, placement, and cumulative impact, MetroPCS first needed to prove it engaged in

20  a "systematic comparison of the sites in question."  See MetroPCS, 400 F.3d at 729.  It

21  failed to do so, however, as the court finds the City's evidence more persuasive than

22  MetroPCS'.  Ms. Estes' testimony and analysis was unduly limited and superficial, as it

23  failed to introduce individualized proof regarding the competing sites at issue.  Her analysis

24  focused primarily on the location preference system set forth in the Siting Guidelines, and

25  failed to take into account factors such as photo simulations, technical specifications, or the

26  level of community opposition in comparing the differing sites.  Rather, Ms. Estes'

27  comparison of other facilities to the 5200 Geary site is based on her knowledge as to the

28

United States District Court

For the Northern District of California

1    address, zoning district, type of building, and equipment location for those other facilities.

2    Her analysis and report fail to take into account the actual requirements of Planning Code §

3    303(c), which requires that any proposed conditional use be necessary, desirable for and

4    compatible with the surrounding neighborhood or community.  As the City's expert Mr.

5    Badiner pointed out, this code provision is the governing law pursuant to which the City

6    determines whether to issue CUP applications, and the City's CUP determinations pursuant

7    to it encompass a broader range of factors than the location preference system and surface

8    information considered by Ms. Estes.  In short, Mr. Badiner effectively refuted Ms. Estes'

9    testimony with comprehensive and credible testimony.

10          MetroPCS contends that Ms. Estes' analysis and report, although based on the

11   above limited factors, nonetheless constitute a "systematic comparison" sufficient to satisfy

12   the requirement that MetroPCS prove it is similarly situated in terms of "structure,

13   placement, and cumulative impact" to other carriers.  This is because MetroPCS interprets

14   the "structure, placement, and cumulative impact" language contained in the MetroPCS

15   decision narrowly, claiming that the language literally requires only a comparison of

16   address, zoning district, and equipment location.  The City, for its part, argues that the

17   "structure, placement, and cumulative impact" language cannot be read so narrowly that it

18   excludes the requirements of section 303(c) of the Planning Code.

19          It is true that the language of the MetroPCS decision setting forth the "structure,

20   placement, and cumulative impact" standard could be read in the narrow, literal way

21   advanced by MetroPCS.  However, the court concludes that such a reading is not the most

22   likely, or intended one.  For in discussing the unreasonable discrimination claim, the Ninth

23   Circuit in MetroPCS expressly stated that the legislative intent of the TCA's anti-

24   discrimination provision was to "provide localities with the flexibility to treat facilities that

25   create different visual, aesthetic, or safety concerns differently to the extent permitted

26   *under generally applicable zoning requirements*...".  See 400 F.3d at 727 (emphasis

27   added).  As a matter of common sense, then, the "structure, placement, and cumulative

28

26

United States District Court

For the Northern District of California

1   impact" standard set forth elsewhere by the court to determine whether discrimination has

2   taken place must also presume consideration of generally applicable zoning requirements

3   such as section 303(c) of the Planning Code.

4        The court is mindful that this interpretation of "structure, placement, and cumulative

5   impact" is not without some friction: on the one hand, if the court adopts MetroPCS'

6   interpretation of what "structure, placement, and cumulative impact" means, then providers

7   will always be able to show that their sites are similarly situated to competing carriers' sites

8   – simply by hiring an expert to do a survey of locations, equipment description, and zoning

9   district.  On the other hand, if the court adopts the view that "structure, placement, and

10  cumulative impact" is meant to incorporate the standards set forth in section 303(c) of the

11  Planning Code, it is possible that the City could always challenge a plaintiff's proof that it

12  was similarly situated with evidence that there is some additional factor considered by the

13  Planning Code, that plaintiff failed to take into account.

14       Nonetheless, the court determines that the latter interpretation is preferable here. As

15  such, the section 303(c) Planning Code factors highlighted by the City here – in particular,

16  the element of neighborhood desirability and compatibility – are within the ambit of

17  "structure, placement, and cumulative impact," as set forth by the Ninth Circuit in

18  MetroPCS, and the court finds that MetroPCS has failed to introduce proof of a systematic

19  comparison of the proposed 5200 Geary site to other carriers' wireless facilities in the same

20  vicinity.

21       In view of the court's finding that Ms. Estes failed to take such factors into account in

22  her analysis of whether the proposed Geary site is similarly situated to other wireless

23  carriers' sites, and MetroPCS' reliance on Ms. Estes' testimony for proof of its

24  discrimination claim, the court finds that MetroPCS has failed to meet its burden in proving

25  that it was similarly situated to other carriers.

26       Even if the court were to conclude, however, that Ms. Estes' testimony was sufficient

27  to demonstrate that MetroPCS was similarly situated to other competing carriers, all that

28

27

United States District Court

For the Northern District of California

1    MetroPCS would have shown is differential treatment – i.e., that it was denied an

2    application for a CUP at the 5200 Geary site, while other carriers were granted such

3    applications at nearby sites.  This is not enough for MetroPCS to prove its claim.  Rather,

4    MetroPCS must also prove that such differential treatment was *unreasonable*.  And as the

5    Ninth Circuit found, differential treatment that is based, as here, on traditional bases of

6    zoning regulation – including consideration for community and neighborhood – are

7    inherently reasonable.  See MetroPCS, 400 F.3d at 727 (discrimination based on

8    "traditional bases of zoning regulation," such as "preserving the character of the

9    neighborhood and avoiding aesthetic blight" are reasonable and permissible).

10        This conclusion is reinforced by other evidence introduced in this case.  That

11   evidence demonstrates that, far from attempting to discriminate against MetroPCS, the City

12   has granted at least 18 applications for CUPs submitted by MetroPCS, including three

13   MetroPCS CUP applications to construct wireless facilities in the Richmond District.  In

14   each case, the City found that the proposed conditional use was necessary or desirable for,

15   and compatible with, the neighborhood or the community.  See Exhs. A57 - A71.

16   Moreover, and as the parties stipulated, the City has also denied applications for

17   conditional use permits submitted by almost every major wireless carrier serving San

18   Francisco.  See Exhs. A1, A3 - A6, A10 - A15.  In each of these cases, as was the case in

19   connection with the City's denial of MetroPCS' CUP application, the City found that the

20   proposed conditional use was *not* necessary or desirable for, and compatible with, the

21   neighborhood or the community.  See id.  Accordingly, there is simply no evidence that the

22   City has purposefully engaged in any attempt to consciously or otherwise unreasonably

23   discriminate against MetroPCS.

24        In sum, and for all the above reasons, the court finds that MetroPCS has failed to

25   prove that the City unreasonably discriminated against it, in violation of 47 U.S.C. §

26   332(c)(7)(B)(I), by denying MetroPCS' CUP application in connection with the proposed

27   5200 Geary site.

28

United States District Court

For the Northern District of California

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

C.      Equal Protection Claim

In order for MetroPCS to succeed on its section 1983 claim alleging denial of equal protection, MetroPCS must establish "that it has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." See Squaw Valley Dev. Co. v. Goldberg, 375 F.3d 936, 944 (9th Cir. 2004).  Even if a rational basis is present, if MetroPCS can show that the City's rational basis is a pretext for an "impermissible motive," it can still prevail.  See id.  As the Ninth Circuit in Squaw Valley held, "pretext" may be shown by proof that either the proffered rational basis was objectively false, or that the defendant actually acted based on an improper motive.  See 375 F.3d at 946.

Preliminarily, the court notes that it has passed upon MetroPCS' equal protection claim once before.  In ruling on the City's earlier motion for summary judgment, the court presumed differential treatment as a result of the City's denial of MetroPCS' CUP application, but found that a rational basis for such differential treatment existed.  See Order Granting Summary Judgment in Part and Denying Summary Judgment in Part and Denying Jury Demand at 8; see also Exh. 83.  Accordingly, the issue at trial was whether MetroPCS could meet its burden in demonstrating that the City's rational basis for denying its CUP application (i.e., its written findings) were a pretext for a discriminatory motive.  As discussed below, it has not.

The parties initially dispute the standard that MetroPCS must meet in order to show pretext.  The City contends that prextext may be shown by proving either (1) that the proffered rational basis was objectively false, or (2) that the defendant actually acted based on an improper motive.  MetroPCS contends that, while those are certainly proper methods of showing pretext, they are not the exclusive means of proving pretext.  MetroPCS is correct.  A close reading of Squaw Valley reveals that, in delineating the objective falsity and improper motive standards, the Ninth Circuit did not set forth the exclusive means through which to prove pretext.  See 375 F.3d at 946 (pretext *may* be established by

United States District Court

For the Northern District of California

1   demonstrating "objective falsity" or "improper motive") (emphasis added).  Accordingly,

2   MetroPCS is permitted to prove pretext through objective falsity, improper motive, or any

3   other means sufficiently indicating that the City's rational basis was a "pretext for 'an

4   impermissible motive.'"  See id. at 944.

5         MetroPCS attempted to prove pretext by demonstrating that the City's findings in

6   denying its CUP application were contrary to the facts.  MetroPCS specifically pointed to 5

7   distinct findings made by the Board in its denial that it asserts can be demonstrated to be

8   contrary to the actual facts.  See Exh. 18 at G697-98.  These findings (which are tied to the

9   considerations set forth in the Siting Guidelines) focus on the visual aspects of the

10  proposed antennas on the 5200 Geary site, and the effects of the proposed site on (1)

11  housing and neighborhood character, (2) the City's supply of affordable housing, and (3)

12  the City's preparedness in the event of an earthquake.  See id.

13        In support of its argument that these findings were a pretext, MetroPCS introduced

14  photographs of the proposed antennas that purportedly belie the Board's findings.  See

15  Exh. 89, 90 at G642-53, G188-89.  It also relies on the location preference system and Ms.

16  Estes' testimony as proof of the Board's purportedly "contradictory" findings as to other

17  carriers' cell sites.  MetroPCS further points out that the City's own witness, Mr. Badiner,

18  testified that he had previously come to the opposite conclusion from the Board as to some

19  of the findings upon which the Board's decision was based, as did Supervisor Daly.  It also

20  points out that there is "no evidence" as to the Board's remaining findings.  Finally,

21  MetroPCS relies on the comments of numerous supervisors at the hearing on the appeal of

22  the Planning Commission's grant of MetroPCS' CUP application, as proof that these

23  comments demonstrate "animosity" toward MetroPCS.  See Exh. 90, Vol. I.  Notably,

24  MetroPCS fails to point to the specific comments about which it complains, relying

25  generally on the administrative record.

26        MetroPCS' reliance on this evidence is misplaced.  To begin with, the court agrees

27  with the City that it is MetroPCS' burden to demonstrate that all of the Board's findings –

28

30

United States District Court

For the Northern District of California

1    and not just some – were a pretext.  See Charter Commc'n. v. County of Santa Cruz, 304

2    F.3d 927, 933 (9th Cir. 2002) (holding that local government's decision "should be upheld

3    as long as there is substantial evidence for any one sufficient reason for denial").

4    Accordingly, if MetroPCS fails to demonstrate the objective falsity or pretextual nature of

5    even one of the Board's findings, the Board's decision must be upheld.

6         This is the case here.  With respect to the *majority* of the specific findings that

7    MetroPCS challenges – regarding the effect of the proposed site on housing and

8    neighborhood character, the City's supply of affordable housing, and on the City's

9    preparedness in the event of an earthquake – MetroPCS' only proof of pretext can really be

10   boiled down to two points:  (1) there is "no evidence" to support the Board's findings, which

11   were contradictory to the Planning Commission's more accurate findings; and (2) that City

12   witnesses – including Mr. Badiner and Supervisor Daly – testified contrary to the Board's

13   position on at least one of the findings that MetroPCS takes issue with.

14        This is insufficient proof of pretext.  In the first place, the court has already previously

15   held that the Board's findings were based on substantial evidence, and they cannot be

16   attacked for lack of evidence now.  See Order on Cross-Motions for Summary Judgment

17   (dated 4/25/03).  Moreover, it is MetroPCS' burden, and not the City's, to present proof that

18   the Board's findings were actually objectively false or based on an impermissible motive,

19   rather than simply pointing out a purported lack of evidence, without identifying the type of

20   evidence that would be necessary.  Here, MetroPCS has failed to introduce any affirmative

21   independent evidence that the findings it complains of were somehow false or otherwise

22   based on some suspect factor.  Reliance on photographs that formed part of the record

23   before the Board on appeal do not satisfy its burden.  In short, MetroPCS has introduced

24   no proof that, in the context of this case, the Board's findings were a pretext.

25        Second, MetroPCS misconstrues the testimony of the City's expert, Mr. Badiner.

26   While he did in fact testify that he originally believed that the criteria set forth in the Siting

27   Guidelines had been met by MetroPCS in its CUP application, he also testified that upon

28

United States District Court

For the Northern District of California

1    subsequent review, and as of the time he was called to testify, he believed that other

2    considerations warranted the Board's ultimate findings denying the application.  Such

3    considerations include, for example, the public testimony and record before the Board at

4    the hearing on the appeal of the CUP application.  As for MetroPCS' reliance on Supervisor

5    Daly's purported comment that was contradictory to one of the Board's findings (regarding

6    earthquake preparedness), MetroPCS fails to point the court to the specific location of

7    Supervisor Daly's testimony, improperly relying on its general citation to the administrative

8    record.  See, e.g., Keenan v. Allan, 91 F.3d 1275, 1279 (9th Cir.1996)(holding that parties

9    must identify the evidence with "reasonable particularity").  Even crediting the comment,

10   however, one comment made by one supervisor with respect to one finding is simply not

11   enough to prove pretext as to all the Board's findings as a whole.  In short, MetroPCS has

12   not proven pretext with respect to any of the specific findings it complains about, let alone

13   all the findings upon which the Board based its decision.

14        The undisputed evidence introduced by the parties also tends to demonstrate the

15   non-existence of pretext.  For example, and as Mr. Badiner testified, the Board heard

16   testimony during the hearing on MetroPCS' CUP appeal regarding the necessity,

17   desirability, and compatibility of the proposed 5200 Geary site with the Richmond

18   community.  This included the heated testimony of numerous local residents opposed to

19   the proposed site.  Not only was it proper for the Board to take opposing residents' views

20   into account, but it is reasonable to conclude that the Board took these views into account

21   in deciding that the proposed 5200 Geary site was ultimately *not* necessary, desirable or

22   compatible with the neighborhood.

23        In view of this evidence, and MetroPCS' failure to come forward with other

24   affirmative proof of pretext, there is simply no basis upon which to conclude that the

25   Board's findings were objectively false, based on an improper motive, or otherwise

26   ultimately pretextual.

27        Moreover, even if MetroPCS had been able to demonstrate pretext, it would still not

28

be able to demonstrate that the City was motivated by a discriminatory or otherwise impermissible motive.  The evidence here demonstrates that the City has granted MetroPCS numerous CUP applications previously in order to construct wireless facilities, that the Board itself has both denied and affirmed appeals from various decisions of the Planning Commission granting CUP applications, and that the City has approved several leases allowing MetroPCS to construct wireless facilities.  See, e.g., Exhs. A1 - A15, A57 - A71, A23 at G693-700.

In short, the court concludes that MetroPCS has failed to prove that by denying the CUP for the 5200 Geary site, the City also denied MetroPCS equal protection under the law.

### CONCLUSION

In accordance with the foregoing findings of fact and conclusions of law, judgment is entered in favor of defendant and against plaintiff.  The clerk shall close the file.

**IT IS SO ORDERED.**

Dated: June 16, 2006

_____
PHYLLIS J. HAMILTON
United States District Judge

United States District Court
For the Northern District of California